844 F.2d 1506
 PANOLA LAND BUYING ASSOCIATION, Plaintiff,
Richard J. Ebbinghouse, Movant-Appellant,
v.
Vance CLARK, Administrator, Farmer's Home Administration,
United States Department of Agriculture in his
official capacity, et al., Defendants- Appellees.
 No. 86-7704.
 United States Court of Appeals,
Eleventh Circuit.
 May 17, 1988.
 
 Richard J. Ebbinghouse, Birmingham, Ala., pro se.
 Abigail Turner, Legal Services Corp. of Alabama, Mobile, Ala., for movant-appellant.
 John Zippert, pro se.
 Kevin J. Hasson, Office of Legal Counsel, U.S. Dept. of Justice, William Kanter, Appellate Staff, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Frank W. Donaldson, U.S. Atty., Birmingham, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before JOHNSON and CLARK, Circuit Judges, and EATON*, Senior District Judge.
 EATON, Senior District Judge:
 This appeal was filed by Richard J. Ebbinghouse, former attorney for the Panola Land Buying Association, a mutual self-help non-profit housing corporation, (Panola),[1] from the district court's denial of Ebbinghouse's Rule 24(a)(2), Fed.R.Civ.P. motion to intervene as a party in the case. Accompanying the motion to intervene was Ebbinghouse's "Petition For Attorney's Fees," which we construe to be the pleading (complaint) required by Rule 24(c), Fed.R.Civ.P. In it Ebbinghouse alleges that he is entitled to recover fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, (EAJA),[2] and under the State of Alabama's attorney's lien statute.
 
 
 1
 On May 27, 1982, Ebbinghouse, while employed as a staff attorney with the Legal Services Corporation of Alabama, Inc. (Legal Services) instituted the underlying action for Panola, and represented Panola in the case until June 5, 1986. In the interim, Ebbinghouse, in June of 1984, opened his own office for the practice of law.[3] After opening his office, he successfully represented Panola on an appeal from an adverse summary judgment. Trial of the underlying case was set for June 9, 1986. Settlement negotiations ensued. According to Ebbinghouse, on May 23, 1986, "all issues of the settlement that was signed by the parties and filed by the parties were successfully negotiated, except the attorney's fee issue." (Brief for Appellant at 11.) Ebbinghouse participated in those negotiations. The document to which Ebbinghouse refers is entitled "Settlement Agreement." It contains a provision entitled, "Attorney's Fees and Costs," which reads: "Each side agrees to bear its own costs and attorney fees with the exception that plaintiff shall retain the costs of appeal paid by the defendants in the amount of $462.20." Ebbinghouse refused to sign the "settlement agreement" on his client's behalf since, according to Ebbinghouse, "to do so would constitute a waiver of attorney's fees." (Brief for Appellant at 12.) He "refused to sign any agreement wherein he would waive his attorney's fees." (Brief for Appellant at 3.) In the meantime, Ebbinghouse, feeling that "the district court must supervise fee waivers," (Brief for Appellant at 19.) sought "mediation of the Court," (Brief for Appellant at 3.) in reference to the settlement negotiations. Ebbinghouse wished to establish before the district court that the defendants had no reasonable defense on the merits of the case and that the defendants were engaged in the common and continuous practice of coercing fee waivers as a condition to settlement "as a part of a vindictive effort to teach counsel he had better not bring such cases." The district judge did not mediate,[4] recognizing that if parties to a case can agree to terms, they are free to settle the litigation and the court need not and should not get involved, Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1189, (8th Cir.1984), United States v. City of Miami, 614 F.2d 1322, 1330 (5th Cir.1980) modified on rehearing, 664 F.2d 435 (1981).
 
 
 2
 On May 27, 1986, the parties notified the district judge that they had reached a settlement. On June 5, 1986, Panola sent Ebbinghouse a letter[5] by which Panola painfully "dismissed" Ebbinghouse as Panola's counsel. On June 26, 1986, a staff attorney for Legal Services, referred to by Ebbinghouse as his "co-counsel in the case," signed the "settlement agreement" on behalf of Panola. A copy of that document was received by the district judge's office and filed with the Clerk of the court on July 7, 1986. On July 28, 1986, Ebbinghouse filed his motion to intervene which was denied on September 11, 1986.
 
 
 3
 "SETTLEMENT AGREEMENT"
 
 
 4
 Before discussing the rejected complaint, it must be pointed out that the document consistently referred to by the parties and Ebbinghouse as a "settlement agreement," and treated by them on this appeal as a settlement agreement, is not a settlement agreement at all. The underlying case is still pending. The document is quite obviously a conditional agreement[6] imposing conditions to settlement upon Panola and the defendants. Nevertheless, it contains a waiver of attorney's fees--and a complete release of liability in favor of the defendants in an ongoing case. In effect, Panola and the defendants effectively continued the scheduled trial indefinitely, Panola hoping that all of the conditions in the "settlement agreement" would be fulfilled and that the case would settle satisfactorily in the future.
 
 
 5
 Ebbinghouse's proposed complaint asserted that "whatever bearing paragraph 13 of the 'settlement agreement' may have upon the parties, it is not binding upon petitioner and does not constitute a waiver of petitioner's fees;" (p # 16 of the complaint), and that Ebbinghouse is entitled to claim fees in his own behalf under both 28 U.S.C. Secs. 2412(d)(1)(A) and 2412(b).
 
 
 6
 Further, the proposed complaint alleged that the defendants were engaged in a common and continuous practice of requiring fee waivers as a condition of settlement as part of a vindictive effort "to teach counsel he had better not bring such cases."[7]
 
 
 7
 "PETITION FOR ATTORNEY'S FEES" UNDER EAJA
 
 
 8
 The district judge denied Ebbinghouse intervention to seek attorney's fees under the EAJA on the "party-specific" standing issue rather than on the "issue-specific" ripeness issue, related "subheadings" of the justiciability requirement. In view of the conditional nature of the "settlement agreement" the district judge might have approached the justiciability question the motion to intervene presented by considering whether Ebbinghouse's complaint was more than "an ingenious academic exercise in the conceivable." United States v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254, 270 (1973). However, the district judge disposed of the motion to intervene to claim attorney's fees under the EAJA by utilizing the prudential[8] doctrine that a complainant must assert his own legal rights and interest and cannot rest his claim to relief on the legal rights or interests of third parties.
 
 
 9
 Because of the nature of Ebbinghouse's claim under the EAJA, we, too, need not venture too far into the labyrinth of "standing." Rule 24(a)(2), Fed.R.Civ.P., permits intervention "when the applicant claims an interest relating to the property or to the transaction which is the subject of the action and he is so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest." (Emphasis supplied.) The interest relating to the transaction required for intervention is "a direct, substantial, legally protectable interest in the proceedings."[9] (Emphasis supplied.) Diaz v. Southern Drilling Corp., 427 F.2d 1118, 1124 (5th Cir.1970), Hobson v. Hansen, 44 F.R.D. 18, 24 (D.D.C. 1968); 7C Wright, Miller & Kane, Federal Practice and Procedure, Sec. 1908, at 271 (1986).
 
 
 10
 Although standing in no way depends on the merits of the contention of the applicant for intervention, it often turns on the nature and source of the claim asserted. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).
 
 
 11
 Other than Ebbinghouse's claim under Alabama's attorney's lien statute, the source of his claim is the EAJA.[10] Examination of the language and purpose of that source and of the history of Federal fee-shifting statutes makes it clear that the EAJA does not afford Ebbinghouse party status to assert a legally protectable right.
 
 
 12
 It is readily apparent that the party eligible to recover attorney's fees under the EAJA as part of its litigation expenses is the prevailing party. The inquiry here, however, is whether under the EAJA Appellant as former counsel for Panola also has standing to claim attorney's fees from the government.
 
 
 13
 The primary purpose of the EAJA is to deter the government from bringing unfounded suits or engaging in unreasonable administrative behavior. That goal is in part achieved by rectifying "the disparity between the resources and expenditure of ... individuals and their government." 5 U.S. Code Cong. & Admin. News 1980, pp. 4953, 4984. As the House Report states:
 
 
 14
 Providing an award of fees to a prevailing party represents one way to improve citizen access to courts and administrative proceedings. When there is an opportunity to recover costs, a party does not have to choose between acquiescing to an unreasonable Government order or prevailing to his financial detriment. Thus, by allowing an award of reasonable fees and expenses against the Government when its action is not substantially justified, S. 265 provides individuals an effective legal or administrative remedy where none now exists. By allowing a decision to contest Government action to be based on the merits of the case rather than the cost of litigating, S. 265 helps assure that administrative decisions reflect informed deliberation. In so doing, fee-shifting becomes an instrument for curbing excessive regulation and the unreasonable exercise of Government authority.
 
 
 15
 Id. at 4991.
 
 
 16
 The statutory framework chosen by Congress to accomplish these goals consists of two parts. The first, (Section 2412(b)), which is not limited to small businesses or relatively impecunious private parties, authorizes the courts to award attorney fees and expenses of attorneys against the United States, "to the same extent that any other party would be liable under the common law or any statute." This section waives sovereign immunity. It provides that the United States will be subject to the common law and statutory exception to the American rule regarding attorneys' fees.
 
 
 17
 The second, (Section 2412(d)(1)(A)), which applies only to relatively impecunious parties,[11] is a cost provision which under the prescribed circumstances[12] imposes cost obligations[13] upon the government which are in addition to the costs provided for in (a). In employing the "prevailing party" language, Congress recognized that throughout our history litigation costs generally have been awarded to the prevailing party.[14] Over the years attorneys for prevailing parties have not paid the costs of their clients' litigation and they have not petitioned in their own rights for the costs of litigation.
 
 
 18
 Since Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), in the absence of a contractual agreement between the parties, applicable state law in appropriate cases, or one of the common law exceptions to the American rule, federal courts have not been empowered to award attorneys' fees unless authority has been specifically conferred upon them by a federal statute. To date over 130 statutory grants of authority having to do with particular types of litigation have been enacted by Congress. Practically all of them confer the right to recover attorneys' fees upon the parties themselves, rather than upon the attorneys.[15] Berger, Court Awarded Attorney's Fees, 126 U.Pa.L.Rev. 304. It has not been unusual for those of us in the legal profession subjectively to consider that such fee provisions were enacted for the benefit of the Bar, but that is not the case. They were enacted for the benefit of the persons the statutes are designed to reach. They proceed from the assumption that the wealth of the party shall not determine the party's capability to enforce the rights conferred by the statute.
 
 
 19
 In addition to the straightforward "prevailing party" language in the EAJA, there are provisions within the statute which affirmatively rule out the attorney as a recognized applicant for fees and expenses. We shall discuss two of these provisions. (1). In the "fees and other expenses" definition, attorneys are treated in the same manner as expert witnesses, engineers, scientists, analysts, or other persons found by the court to be necessary for the preparation of the party's case. Congress did not intend that all persons performing services to the prevailing party in the litigation be allowed to become parties in the case to assert their claims for compensation. Those persons look to the party that obtained their services--just as does the attorney for the party. The prevailing party may look to the opposing party for its costs.
 
 
 20
 (2). Section (d)(1)(B) requires a prevailing party seeking an award of fees and other expenses under (d)(1)(A) to submit "an application for fees and other expenses which shows ... and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses are computed." That provision clearly manifests Congress' intent that the prevailing party's lawyer is not considered to be an applicant under the EAJA.
 
 
 21
 Had Congress provided attorneys a right to claim fees independent of the right of the prevailing party, the courts would have been obligated to entertain successive claims for fees when one lawyer for the prevailing party succeeds another in the litigation. Not only might more than one award have been required, but contests between successive lawyers for the same party could have developed over questions regarding which lawyer performed particular services for the prevailing party.
 
 
 22
 Further, if clients and their lawyers had independent entitlements in the same action, conflicts of interest between attorney and client would develop. Historically, the client and the lawyer make their fee arrangement, and the lawyer looks to the client for payment of the legal fee.[16] The lawyer represents and advises, but the client controls the litigation. In enacting the EAJA, Congress recognized and maintained the attorney-client relationship as it has existed throughout our history.
 
 The James Case
 
 23
 In attempting to simplify the approaches taken by Ebbinghouse in his search for an attorney's fee, we said at the outset that Ebbinghouse alleges that he is entitled to recover attorney's fees under the EAJA and under Alabama's attorney's lien statute. However, in his discussion of this Court's opinion in James v. Home Const. Co. of Mobile, 689 F.2d 1357 (11th Cir.1982), he attempts to combine those two approaches. Recognizing that in the settlement agreement in James attorney's fee questions were expressly left open for the court to determine, Ebbinghouse argues that James is nevertheless determinative of this case. His reasoning is as follows:
 
 
 24
 In James, leaving open the fees issue was in effect an assignment of the right to pursue fees. This court held that the attorney had standing to pursue the fees .... By statute, an attorney's lien is an assignment to pursue the case.... The statute [Alabama Attorney's Lien Statute] provides that the attorney stands in the shoes of the client and thus, standing by operation of law is conferred on the attorney. It is the attorney's lien statute that 'bestows' standing on the attorney in the fee statute [EAJA] itself.
 
 
 25
 Since EAJA is silent on who the question of standing, state law should govern resolutions of this issue.... Alabama law provides who may assert a client's cause of action.
 
 
 26
 Brief for Appellant at 45, 46.
 
 
 27
 The district judge classified that approach as "an attempt to bootstrap standing under the EAJA." We mention it only to demonstrate that the principle distinction between this case and the James case, upon which Appellant says he relied when he agreed to continue to represent Panola upon his entering private practice, is clear.
 
 
 28
 For our discussion of James, we borrow Chief Judge Wald's analysis of James in her excellent opinion in Freeman v. B & B Associates, 790 F.2d 145 (D.C.Cir.1986).
 
 
 29
 In James, the Eleventh Circuit found that a successful attorney in a TILA case had standing to seek fees after the settlement of the borrower's underlying claim. The settlement agreement, however, expressly left open the existence of the lawyer's fees. The Eleventh Circuit found that under these circumstances section 1640(a)(3) created a 'right of action' for attorneys to seek fee awards, ...
 
 
 30
 James involved an attorney's standing to pursue his client's claim for attorneys' fees under TILA. James is silent on the question of an attorney's right of action where the client has expressly waived any claim to attorneys' fees....
 
 
 31
 In fact, however, we read the rationale in James as applicable solely to the issue of the attorney's standing to seek attorneys' fees. See Moore v. National Association of Securities Dealers, Inc., 762 F.2d 1093, 1099 n. 10 (D.C.Cir.1985) (opinion of MacKinnon, J.) (attorney's right to fees under Title VII is one of subrogation to his client's.... This more limited reading of James accords with cases in which an attorney has been found in some circumstances to have standing to pursue his client's claim for attorneys' fees in civil rights cases. See, e.g., Lipscomb v. Wise, 643 F.2d 319 (5th Cir.1981) ...[17]
 
 
 32
 790 at 148, 149.
 
 
 33
 In Evans v. Jeff D., 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Supreme Court pointed out (not necessarily with approval), when comparing James with cases which hold that Congress bestowed on the prevailing party statutory eligibility for a discretionary award of attorney's fees in specified civil rights actions, that this court in James was construing the Truth In Lending Act, 15 U.S.C.A. Secs. 1601 et seq., (TILA), mandatory award of attorneys' fees. 106 S.Ct. at 1539, n. 19, 89 L.Ed.2d at 760, n. 19.
 
 THE INDIGENT CLIENT AND THE EAJA
 
 34
 To say the least, this is not your usual case. Before us is an appellant who asserts that his former client's signing of a document containing a waiver of attorney's fees does not affect his independent right to claim fees under the EAJA, yet who earnestly seeks to challenge the fee waiver provision. Had Ebbinghouse an independent right under the EAJA to claim attorney's fees, a challenge to the waiver provision in the document signed by his former client and not by him would not be necessary.
 
 
 35
 Further, Appellant stresses that the defendants required the fee waiver provision as a condition of settlement, yet he seeks to challenge that provision considering that a successful challenge could not cause the entire "settlement agreement" to be annulled. The attorney for Panola, the "amicus", supports the Appellant's position and writes that, "his clients [Panola], against his [Ebbinghouse's] advice agreed to the defendants ultimatum of a waiver of fees." (Brief of Amicus at 9.) Yet, Legal Services' client, Panola, "has no interest in challenging the coerced waiver." (Brief for Appellant at 25.)
 
 
 36
 In addition to Appellant's understandable interest in being fully paid for his services to Panola, this case appears to be a concerted effort by Legal Services and the Appellant (with the acquiescence of Panola, see letter, Appendix II), to establish that when the government negotiates settlements with indigent or poor parties it consistently insists upon a waiver of fees when it has no realistic defense on the merits, and to have this court rule that a waiver by indigent or poor clients of attorneys' fees does not prevent attorneys from seeking fees under the EAJA.
 
 
 37
 Legal Services and the Appellant foresee continuing recurrence of the fee waiver problem when Legal Services refers to private counsel cases which involve federal fee-shifting statutes. They are concerned that indigent plaintiffs will exploit the attorney fee provision of the EAJA to their own best advantage in settlement negotiations.
 
 
 38
 Legal Services tells us: "Prior to Evans,[18] competent federal litigators in Alabama were refusing to accept civil rights cases because of the great professional and personal costs. Post Evans, the likelihood of recovering fees is further diminished; thus, black groups like plaintiff will often be unable to obtain counsel for important civil rights litigation." (Brief of Amicus at 9.)
 
 
 39
 The Appellant warns that "the ability of indigent persons to obtain counsel" is "at stake" in this case.
 
 
 40
 The Supreme Court in Evans considered the problem raised by the Legal Services attorney and the Appellant. The Court, in discussing 42 U.S.C.A. Sec. 1988, wrote:
 
 
 41
 We are cognizant of the possibility that decisions by individual clients to bargain away fee awards may, in the aggregate and in the long run, diminish lawyers' expectations of statutory fees in civil rights cases. If this occurred, the pool of lawyers willing to represent plaintiffs in such cases might shrink, constricting the 'effective access to the judicial process' for persons with civil rights grievances which the Fees Act was intended to provide. H.R.Rep. No. 94-1558, P. 1 (1976). That the 'tyranny of small decisions' may operate in this fashion is not to say that there is any reason or documentation to support such a concern at the present time. Comment on this issue is therefore premature at this juncture. We believe, however, that as a practical matter the likelihood of this circumstance arising is remote. See Moore v. National Assn. of Securities Dealers, Inc., 246 U.S.App.D.C., at 133, n. 1, 762 F.2d, [1093] at 1112, n. 1 (Wald, J., concurring in judgment).
 
 
 42
 Evans, 106 S.Ct. at 1545 n. 34, 89 L.Ed.2d at 766 n. 34.
 
 
 43
 However, Mr. Justice Brennan in his dissenting opinion responded, "it does not require a sociological study to see that permitting fee waivers will make it more difficult for civil rights plaintiffs to obtain legal assistance. It requires only common sense." Evans, 106 S.Ct. at 1552, 89 L.Ed.2d at 775.
 
 
 44
 In context, it must be recognized that the EAJA is designed to make it expedient for individuals, small businesses and certain organizations to challenge unreasonable government action. The "$2,000,000 net worth" eligibility limitation upon individuals and the "$7,000,000 net worth and no more than 500 employees" eligibility limitations upon businesses are not stringent limitations, and attorney fee waivers by prevailing parties, of course, do not relieve those parties from their obligations to their lawyers.
 
 
 45
 The problem Legal Services and the Appellant foresee is more likely to arise in injunctive actions brought by indigent parties and in the defense by indigent parties of actions brought against them by the government. Even then, as to the availability of counsel to represent the indigent in challenges to government actions, prevailing parties may recover attorneys' fees and expenses only when the government is unable to show that its position was not substantially justified and when no special circumstances exist which would make an award unjust. Thus, awards of attorneys' fees are not routinely made under the EAJA. Nevertheless, the expressed concern is not an illusionary one.
 
 
 46
 Congress has been diligent to provide fee-shifting in its remedial statutes and it has been attentive to the people's right to challenge unreasonable government action. The EAJA initially was an experimental statute. It has been re-enacted and amended. It is for Congress to consider any revision to the EAJA or to otherwise address what the Legal Services attorney and the Appellant see as a serious problem. This court can no more formulate a solution, which it is implored to do in this case, than it can appropriate the funds necessary to effectuate a solution.
 
 ATTORNEY'S LIEN CLAIM
 
 47
 We turn now to Ebbinghouse's motion to intervene to assert an attorney's lien under Alabama law.
 
 
 48
 Federal courts sitting in a state enforce that state's statute creating attorneys' liens.[19] Central Railroad & Bkg. Co. v. Pettus, 113 U.S. 117, 5 S.Ct. 387, 28 L.Ed. 915 (1885), Hoxsey v. Hoffpauir, 180 F.2d 84 (5th Cir.1950), Webster v. Sweat, 65 F.2d 109 (5th Cir.1933), Brooks v. Mandel-Witte Co., 54 F.2d 992 (2d Cir.1932).
 
 
 49
 Under the Alabama lien law,[20] an attorney's lien is enforceable only against monies acquired by the client as a result of the lawyer's services rendered in the particular action or proceeding by which the money is produced. Johnson v. Riddle & Ellis, 204 Ala. 408, 85 So. 701 (1920). No monies upon which an attorney's lien could be enforced are in the hands of either Panola or the district court. As the issues now stand,[21] there will be none. Thus, Ebbinghouse was properly denied intervention to enforce an attorney's lien.
 
 
 50
 Should monies (other than monies the use and distribution of which are controlled by federal law) come into Panola's hands in the underlying case as a result of Ebbinghouse's services, he may then seek to intervene to enforce an attorney's lien. Under such change of circumstances, the September 11, 1986, order denying Ebbinghouse's motion to intervene would not, within itself, bar his future intervention to enforce an attorney's lien.
 
 CONCLUSION
 
 51
 Under the "anomalous rule" we have provisional jurisdiction to determine whether intervention was erroneously denied the Appellant. E.E.O.C. v. Eastern Airlines, Inc., 736 F.2d 635 (11th Cir.1984). Therefore, we have considered the entangled issues presented to the district court and to this court. Having done so, we find that the district court properly denied the Appellant's motion to intervene. Thus, our provisional jurisdiction is exhausted. Accordingly, this appeal is dismissed for want of jurisdiction.
 
 APPENDIX I
 STATUTE
 28 U.S.C. Sec. 2412. Costs and fees
 
 52
 (a) ...
 
 
 53
 (b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.
 
 
 54
 (c)(1) Any judgment against the United States or any agency and any official of the United States acting in his or her official capacity for costs pursuant to subsection (a) ... shall be in addition to any relief provided in the judgment.
 
 
 55
 (2) ...
 
 
 56
 (d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
 
 
 57
 (B) A party seeking an award of fees and other expenses shall, ... submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses are computed. The party shall also allege that the position of the United States was not substantially justified.
 
 
 58
 Whether or not the position of the United States was not substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought.
 
 
 59
 (C) ...
 
 
 60
 (2) For the purposes of this subsection--
 
 
 61
 (A) "fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees ....
 
 
 62
 (B) "party" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed; except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) exempt from taxation under section 501(a) of such Code, or a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a)), may be a party regardless of the net worth of such organization or cooperative association; ...
 
 APPENDIX II
 
 63
 PANOLA LAND BUYING ASSOCIATION, INC.
 
 P.O. BOX 95 EPES, ALABAMA 35460
 ASSOCIATED ORGANIZATIONS:
 PLBA DEVELOPMENT CORPORATION
 
 64
 PLBA HOUSING COOPERATIVE, INC.
 
 PLBA COOPERATIVE STORE
 June 5, 1986
 Attorney Richard J. Ebbinghouse
 504 Brown Marx Tower
 2000 First Avenue North
 Birmingham, Alabama 35203
 Dear Rick:
 
 65
 This letter is written in response to information we received from Abigail Turner. She explained to us that the FmHA attorney had given us three (3) alternatives before they would sign the settlement agreement with PLBA-HDC on the additional housing for Wendy Hills: that you would withdraw as counsel; that you would voluntarily sign the agreement; or that we would dismiss you as counsel.
 
 
 66
 Based on your statements to the court in the request for pre-trial conference and your statements to Abigail, we understand that you have declined to choose either of the first two options. Regrettably, we feel we must choose the third option of dismissing you as our attorney on this case. This is a painful option for us, and we hope you will understand the reasons we believe we are forced to choose this course of action due to the ultimatum we have received from the government.
 
 
 67
 It is our judgment that we must accept the government's settlement offer because there are monies to fund housing at this time, and those monies are unlikely to be available beyond this fiscal year. As you know we have weighed settlement carefully and feel that obtaining housing for poor and black people in west Alabama is our most important goal.
 
 
 68
 We understand the conflict of interest you have written about to us. We are most grateful for your high ethical values and professionalism in being honest about the dilemma and conflict you face. We seriously doubt that we and groups like us will be able to obtain competent and experienced counsel as these fee waiver demands become the government's standard operating procedure.
 
 
 69
 You have been our lawyer through this whole ordeal, beginning with the administrative hearings, the first district court ruling, the successful appeal and trial preparations. We thank you for your fine representation and we resent the government telling us who can represent us. We appreciate the fine result that has come from your legal efforts on our behalf. When Abigail met with our board last week and explained the terms of the settlement, they expressed unhappiness with this choice they had to make.
 
 
 70
 Again thanks for your persistence and high quality work on our behalf. We count you as one of our greatest friends.
 
 
 71
 Cooperatively yours,
 
 
 72
 /s/ Frank C. Cook
 
 Frank L. Cook
 President
 
 73
 /s/ John Zippert
 
 John Zippert
 Secretary
 FLC/JZ:fr
 APPENDIX III
 
 74
 In the United States District Court for the Northern
 
 District of Alabama
 
 75
 Panola Land Buying Association Housing Development Corp., Plaintiffs,
 
 
 76
 v.
 
 
 77
 Vance Clark, Administrator, Farmers Home Administration, et
 
 
 78
 al., Defendants.
 
 Civil Action No. CV-83-G-1216W
 SETTLEMENT AGREEMENT
 
 79
 WHEREAS, the parties to this lawsuit desire to resolve this matter ... without the time and expense of further litigation, ... therefore, prior to the taking of testimony and the trial of this action, and without this agreement or any action taken pursuant hereto constituting evidence or admission by either party as to any issue of law or fact raised by this lawsuit, it is hereby
 
 AGREED as follows:
 I.
 PARTIES
 
 80
 .............................................................
 
 
 81
 ...................
 
 
 82
 * * *
 
 II.
 
 83
 SECTION 515 RURAL COOPERATIVE HOUSING OR RURAL RENTAL HOUSING
 
 
 84
 3. Defendants agree that the sites identified in Exhibit A attached hereto are acceptable locations for Section 515 Rural Cooperative Housing ("RCH") or Rural Rental Housing ("RRH") projects as far as proximity to essential community services is concerned. If because of the results of the market surveys or other problems, these sites are not approved, plaintiff may substitute other sites if FmHA determines that they meet applicable FmHA site regulations.
 
 
 85
 4. If plaintiff satisfies applicable requirements for the Section 515 program, defendants agree to fund Section 515 projects at one or more of those sites not to exceed a total of sixty units; provided, however, that such loans must be obligated on or before September 15, 1986. In addition, defendants agree to provide FmHA rental assistance for thirty of such units for a term of five years, provided that the relevant loan or loans are obligated on or before September 15, 1986. Defendants agree that procedures followed in renewing rental assistance units for other borrowers similarly situated will be followed with respect to plaintiff.
 
 
 86
 5. The parties agree that the preapplication(s) or application(s) may be submitted for Section 515 RRH and/or Section 515 RCH loans, provided, however, that plaintiff must elect to proceed under one program or the other not later than August 15, 1986.
 
 
 87
 6. Both parties agree to utilize their best efforts to process any applications by plaintiff for the funding discussed above in an expeditious manner. Plaintiff agrees to submit any preapplication(s) for such loans not later than June 9, 1986. Defendants agree to notify plaintiff not later than fifteen calendar days following receipt of such a preapplication(s) of any deficiencies. Plaintiff agrees to submit any application(s) for the funding at issue not later than August 1, 1986. Defendants agree to notify plaintiff of any deficiencies in such application(s) not later than fifteen calendar days following receipt of plaintiff's written specification of the type of loan it seeks--rural rental housing or rural cooperative housing--as described in paragraph five (5) of this agreement.
 
 
 88
 7. ...
 
 III.
 LIMITATION ON CHALLENGES TO FmHA ACTIONS
 
 89
 8. Plaintiff agrees, for a period of three years following execution of this agreement, not to submit any preapplication or application to FmHA for any Section 515 multi-family housing at the existing Panola site, and further agrees during the same three-year period not to initiate any new legal action before this or any other court or tribunal concerning the availability of FmHA loans for such Section 515 multi-family housing at the existing Panola Site.
 
 IV.
 RELEASE OF LIABILITY
 
 90
 9. This agreement constitutes a complete release from and bar to causes of action, claims or rights, against Charles Shuman, Vance Clark and Dale Richey, the FmHA, Department of Agriculture, and any of its present, past or future employees in their official or individual capacities, arising from the actions complained of in this lawsuit.V.
 
 DISMISSAL OF THIS ACTION
 
 91
 10. On or before the day the applicable loans are closed or on or before the day of the final inspection after construction, whichever is later, plaintiff agrees to dismiss this action with prejudice.
 
 
 92
 11. Should plaintiff fail to fulfill its obligations under this agreement, defendants will advise plaintiff by written notice of the specific nature of the failure to fulfill its obligations. If plaintiff fails to comply with its obligations within seven (7) calendar days of receipt of the written notice, plaintiff agrees to dismiss this action with prejudice within fifteen (15) calendar days thereafter.
 
 
 93
 12. The parties agree that this settlement agreement will be filed in this Court, signed as received by Judge Guin, and will be a part of the pleadings in this case. However, the filing of this document with the Court and the acknowledgment of its receipt by Judge Guin is not intended to imply any approval or ratification by the Court, or to change its status as a settlement agreement between the parties in any fashion. The sole remedy for any failure by defendants to comply with the terms of this agreement shall be the refusal by plaintiff to dismiss this action.
 
 VI.
 ATTORNEY'S FEES AND COSTS
 
 94
 13. Each side agrees to bear its own costs and attorney fees with the exception that plaintiff shall retain the costs of appeal paid by the defendants in the amount of $462.20.
 
 
 95
 [Signed by representatives of the parties.]
 
 
 96
 (Emphasis supplied.)
 
 CLARK, Circuit Judge, dissenting:
 
 97
 Through the Equal Access to Justice Act, 28 U.S.C. Sec. 2412 ("EAJA"), Congress created a mechanism which enables private citizens to challenge federal government conduct which has no reasonable basis in law or fact.[1] Today, the panel majority has created a mechanism which permits the United States to settle a case and avoid payment of EAJA attorney's fees in a way which will severely hamper, if not nullify, the effective operation of the Act. This case raises a number of important questions which were left open by the Supreme Court in Evans v. Jeff D., 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). If the EAJA is to operate as Congress intended, and the federal courts are to foster settlements as the Supreme Court has instructed, these questions need to be answered. By incorrectly deciding that Ebbinghouse has no "interest" in this litigation, for the purposes of Fed.R.Civ.P. Rule 24(a), the majority has made it impossible for Ebbinghouse, and others who will follow in this circuit, to raise these questions. Because I have concluded that Ebbinghouse's Rule 24 interest was sufficient to bring these matters to the attention of the district court, I would reverse and order a remand to the district court to determine whether the United States' settlement posture was inconsistent with federal law.
 
 I. THE JUDGE'S ROLE IN SETTLEMENT
 
 98
 At the outset, I wish to distance myself from the majority's remarks regarding a federal district court judge's role in the settlement of litigation. As the majority notes, Ebbinghouse's first attempt to apprise the court of the United States' bargaining position came when he asked the court to "mediate." He then sought to bring the matter to the court's attention through a pretrial conference pursuant to Fed.R.Civ.P. 16. In expressing approval of the district court's refusal to participate in the settlement process, the majority notes that when "parties to a case can agree to terms, they are free to settle ... and the court need not and should not get involved." Majority Opinion at 1507. The majority is paraphrasing this court's opinion in United States v. City of Miami, 614 F.2d 1322, (5th Cir.1980), modified on reh'g, 664 F.2d 435 (1981), which reads as follows:
 
 
 99
 If the parties can agree to terms, they are free to settle the litigation at any time and the court should not get involved. As Judge Wyzanski has described the situation: "the traditional view is that the judge merely resolves issues submitted to him by the parties ... and stands indifferently when the parties, for whatever reason commends itself to them, choose to settle a litigation." Heddendorf v. Goldfine, 167 F.Supp. 915, 926 (D.Mass.1958).
 
 
 100
 614 F.2d at 1331 (emphasis added). Judge Wyzanski's views, whatever force they may have as a general matter, are not relevant to a case in which the parties could not, and did not, freely "agree to terms." Once settlement negotiations stall because of a party's intransigence on a given issue, a district judge does not remain indifferent to the settlement process. When such a situation arises, it is no longer true that the judge "should not get involved."
 
 
 101
 The suggestion that the district judge must ignore the dynamics of problematic settlement negotiations is difficult to square with the active role which judges take today in the settlement of federal litigation.[2] It is also difficult to reconcile with the 1983 amendment to Fed.R.Civ.P. 16. The amended rule refers explicitly to settlement in two places: Rule 16(a)(5) makes "facilitating ... settlement" an "objective" of pretrial conferences; and Rule 16(c)(7) makes "the possibility of settlement or the use of extrajudicial procedures to resolve the dispute" a "Subject to be Discussed at Pretrial Conferences." As the advisory committee notes indicate, the 1983 amendment was necessary to "meet the challenge of modern litigation." Fed.R.Civ.P. 16 advisory committee's note. Empirical studies reveal, as the committee explained, that "efficient disposition of cases by 'settlement or trial' is more likely when a trial judge intervenes personally." Id.[3] Although Rule 16 does not require settlement negotiations, it does express a clear preference for encouragement and facilitation of settlements. Id.
 
 
 102
 Ebbinghouse understood that it was proper to invoke the court's Rule 16 powers when settlement negotiations stalled because the government had demanded that Panola waive its right to attorney's fees. As one commentator has recognized, a pretrial conference sought pursuant to Rule 16 is perhaps the best vehicle through which a party can call the court's attention to the fact that an opposing litigant has assumed an unreasonable settlement posture.
 
 
 103
 If plaintiffs' counsel believes he or she is unreasonably being asked to sacrifice a fee, counsel should feel no hesitation about bringing the matter to the attention of the court. Rule 16 of the Federal Rules of Civil Procedure, the pretrial conference rule, gives the court the authority to address the issue.
 
 
 104
 Goldstein, Settlement Offers Contingent Upon Waiver of Attorney's Fees: A Continuing Dilemma After Evans v. Jeff D., 20 Clearinghouse Rev. 693, 698 (Oct. 1986). See also Moore v. National Ass'n of Securities Dealers, 762 F.2d 1093, 1104 n. 15 (D.C.Cir.1985) (unreasonable conduct during settlement negotiations "will be kept in check through the district court's exercise of its Rule 16 ... powers if promptly brought to the court's attention").
 
 
 105
 Even if the judicial "hands off" approach to settlement which is advocated by the majority represented accurately the roles which federal judges do take in the settlement process, it would have no application to this case. The principal allegation made by Ebbinghouse, first as Panola's representative and now on his own behalf, is that the waiver of attorney's fees was the product of a coercive negotiation posture. The record reflects that Panola did not intend to waive its right to attorney fees. Instead, it felt compelled to accept the government's terms because the government conditioned Panola's immediate access to FmHA funds upon such a waiver. See Appendix II to Majority Opinion.
 
 II. EBBINGHOUSE'S RIGHT TO INTERVENE
 
 106
 The majority holds that Ebbinghouse had no "interest" in this litigation for the purposes of Rule 24(a)(2) because any entitlement to attorney's fees under the EAJA is that of the "prevailing party." As a general matter, the majority's definition of a Rule 24 "interest" is much too narrow. The majority's conclusion that Ebbinghouse had no right to intervene rests upon a mistaken assumption that a prospective intervenor's Rule 24 "interest" must be of a nature and magnitude identical to the interests of the parties to a litigation. A number of decisions by our court and others, along with the procedures normally associated with attorney's fee litigation, indicate that Ebbinghouse's interest in this litigation rose to the level of a Rule 24 "interest."
 
 
 107
 The best indication that Ebbinghouse's interest in payment for his legal services is in the nature of a Rule 24 "interest" is our decision in James v. Home Construction Co. of Mobile, Inc., 689 F.2d 1357 (11th Cir.1982). In James, we held that an attorney had an independent right to petition a court for a statutory fee pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. Sec. 1640(a)(3). Although one circuit has disagreed with our decision in James, see Freeman v. B & B Associates, 790 F.2d 145 (D.C.Cir.1986), there is no principled ground upon which the court can say that the principles set forth in James do not apply here. To demonstrate, it is useful to note what Judge Johnson actually wrote for the court in James:
 
 
 108
 Contrary to dicta in Smith v. South Side Loan Co., 567 F.2d 306, 307 (5th Cir.1978), suggesting that attorney's fees are the right of the party suing, we find that it is the attorney who is entitled to fee awards in a TILA case, not the client. This finding is supported by cases holding that a court may directly pay the attorney, Carr v. Blazer Financial Services, Inc., 598 F.2d 1368, 1370 (5th Cir.1979), and that the award is not subject to setoff. Plant v. Blazer Financial Services, Inc., 598 F.2d 1357, 1365 (5th Cir.1979). Denial of this right to attorney's fees would constitute injury in fact, see Warth v. Seldin, [422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ], so an attorney's claim is cognizable under Article III.
 
 
 109
 ... If settlement of a TILA case precluded the plaintiff's attorney from seeking a fee award, nothing would prevent indigent clients, who have no financial interest in statutory fee awards, from freely bargaining them away without personal detriment.
 
 
 110
 689 F.2d at 1358-59. As one commentator has remarked, in James, the court "clearly held that the right to fees is the lawyer's, not the client's." Comment, Settlement Offers Conditioned Upon Waiver of Attorneys' Fees: Policy, Legal, and Ethical Considerations, 131 U.Pa.L.Rev. 793, 813 (1983).[4]
 
 
 111
 It is true that the federal courts "routinely characterize the entitlement of statutory fees as belonging to the prevailing party." Id.; see also Jonas v. Stack, 758 F.2d 567, 570 n. 7 (11th Cir.1985) (construing 42 U.S.C. Sec. 1988). But the courts also routinely recognize that applications for fee awards pursuant to certain statutes are really made by and on behalf of the attorney. As we recognized implicitly in James, it is important to remain mindful of the real dynamics of attorney's fee litigation in cases involving indigent clients because, "where the plaintiff is under no obligation to pay counsel or where the recovery yields no funds to pay counsel, the real party in interest in a motion for fees is the attorney." Comment, 131 U.Pa.L.Rev. at 814.
 
 
 112
 The majority states the obvious: fee-shifting statutes are not typically enacted for the benefit of the bar. Majority Opinion at 1510. Typically, such statutes are designed to make possible litigation which Congress deems desirable. The EAJA allows private parties to challenge unreasonable government conduct when they may otherwise lack the resources to do so. It would do no violence to Congress' purpose in enacting the EAJA or its choice of the term "prevailing party" to hold that, under certain circumstances, a party's attorney may pursue a fee award in his own name. As we suggested in James, by awarding attorney's fees directly to counsel, courts frequently acknowledge that the attorney is the real party in interest in a dispute over attorney's fees. See, e.g., Maher v. Gagne, 448 U.S. 122, 126, 100 S.Ct. 2570, 2573, 65 L.Ed.2d 653 (1980), (affirming 42 U.S.C. Sec. 1988 fee award made directly to counsel); Wedra v. Thomas, 623 F.Supp. 272, 278 (S.D.N.Y.1985) (making EAJA award directly to attorney); Grand Boulevard Improvement Ass'n v. Chicago, 553 F.Supp. 1154, 1169 (N.D.Ill.1982) (making EAJA award directly to attorney).
 
 
 113
 The rule which permits direct payment of attorney's fees to those who have earned them, besides being attributable to common sense, is apparently grounded in the concept that a direct award to the party constitutes a form of unjust enrichment of that party. This idea can be traced to a decision of this court, where we construed the fee-shifting provision of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000a-3(b), which contains the "prevailing party" language found in the EAJA as well as 42 U.S.C. Sec. 1988 ("section 1988"). In Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 539 (5th Cir.1970), we explained that the court had a duty to ensure that a fee award would actually compensate legal services and "not go to litigants" themselves. The Ninth Circuit has characterized our approach in Miller as a rule which protects "against a windfall to the litigant." Brandenburger v. Thompson, 494 F.2d 885, 889 (9th Cir.1974), superseded by statute on other grounds, see Stanford Daily v. Zurcher, 550 F.2d 464, 465 (9th Cir.1977). See also Hairston v. R. & R. Apartments, 510 F.2d 1090, 1093 (7th Cir.1975) (even though fee award pursuant to 42 U.S.C. Sec. 3612(c) "accrue[s] to the benefit of the [prevailing] plaintiff," award should go directly to provider of legal services "[t]o avoid any windfall"); accord Rodriguez v. Taylor, 569 F.2d 1231, 1245 (3d Cir.1977) (construing 29 U.S.C. Sec. 216(b)), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Although the source of the application of unjust enrichment principles to fee-shifting statutes is unclear, it is most probably derived from the theoretical underpinnings of the "common fund" and "common benefit" exceptions to the American Rule regarding attorney's fees and costs. See, e.g., Boeing Co. v. Van Gemert, 444 U.S. 472, 479, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigants expense").
 
 
 114
 A further indication that the attorney is the real party in interest in litigation involving attorney's fees is the rule that counsel has standing to appeal a denial of attorney's fees. In Lipscomb v. Wise, 643 F.2d 319 (5th Cir. Apr. 1981) (per curiam), we held that an attorney could appeal in his own name the denial of an application for fees pursuant to the Votings Right Act of 1965, 42 U.S.C. Sec. 1973l (e). It is important to note that section 1973l (e) is, in pertinent part, identical to 42 U.S.C. Sec. 1988 ("section 1988") and contains, as does the EAJA, the "prevailing party" language which the EAJA borrowed from existing fee-shifting statutes.[5] Our remarks concerning the attorney's standing are instructive:
 
 
 115
 Ordinarily, an appeal from a judgment may be taken only by a party-litigant adversely affected by it. In theory, attorneys for a litigant are not personally affected by a judgment. Even in the limited class of cases in which attorney's fees may be awarded, the award is made to the prevailing party, not to counsel. However, as a practical matter, the lawyer is frequently the only person adversely affected when attorney's fees are denied. An indigent client has no real financial interest in whether his attorney is awarded fees. If the client is not indigent, the attorney may still be the party aggrieved in fact, if the client's net recovery is not affected by the amount allowed for fees. When they are the real parties in interest, attorneys are entitled to a day in court.
 
 
 116
 The lawyers' claims are cognizable under Article III. If the district court's order is affirmed, they will suffer an economic injury in fact. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). They have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). Turning to congressional intent, we believe that allowing attorneys to appeal from a denial of fees under 42 U.S.C. Sec. 1973l (e) "serves the clearly expressed legislative purpose of encouraging private enforcement of the civil rights laws." Palmigiano v. Garrahy, 616 F.2d 598, 602 (1st Cir.1980); Torres v. Sachs, 538 F.2d 10 (2d Cir.1976). See Gates v. Collier, 616 F.2d 1268 (5th Cir.1980) (discussing the civil rights laws generally). Attorneys who bring civil rights suits on behalf of their clients may be secure in the knowledge that they can pursue any legitimate right they may have to attorneys fees in federal court. Finally, we note that "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies," Provident Tradesmen Bank & Trust Co. v. Patterson, 390 U.S. 102, 111, 88 S.Ct. 733, 739, 19 L.Ed.2d 936, 946 (1968), underlying such devices as joinder of necessary parties and pendent jurisdiction, supports allowing an attorney to appeal when he is truly the interested party.
 
 
 117
 Accordingly, we join three other circuits in holding that attorneys may appeal from a denial of attorney's fees to their client. See Dietrich Corp. v. King Resources Co., 596 F.2d 422 (10th Cir.1979); Preston v. United States, 284 F.2d 514 (9th Cir.1960); Angoff v. Goldfine, 270 F.2d 185 (1st Cir.1959); 9 Moore's Federal Practice p 203.06 at 3-23 (2d ed. 1980).
 
 
 118
 643 F.2d at 320-21 (emphasis added).
 
 
 119
 Given our court's prior willingness to look at the economic realities behind fee-shifting statutes, the court should extend the rule in James to fee-shifting statutes which contain the prevailing party language. It simply makes no sense to say that a lawyer can prosecute the appeal of an order denying fees in his own name, but to conclude that an attorney cannot apply for fees in his own name if the statute refers to prevailing parties.
 
 
 120
 The question here, however, is much simpler. The threshold question is merely whether Ebbinghouse has a sufficient "interest" within the meaning of Rule 24(a)(2) to be able to intervene in the underlying action to protect his fee. The majority's wooden application of the term "prevailing party" causes the question to answer itself. Its definition of what constitutes an interest is that of Judge Skelly Wright, cited by this court with approval in Diaz v. Southern Drilling Corp., 427 F.2d 1118, 1124 (5th Cir.) (citing Hobson v. Hansen, 44 F.R.D. 18, 24 (D.D.C.1968)), cert. denied, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). The majority emphasizes that a Rule 24 interest must be "legally protectable" and concludes that it is "clear that the EAJA does not afford Ebbinghouse party status to assert a legally protectable right." Majority Opinion at 2817 (emphasis added). As Judge Johnson's reasoning in James indicates, an attorney's interest in statutory fees, even if derived from his representation of a prevailing party, is a legally protectable interest. Were this not so, contrary to our holding in Lipscomb, an attorney could not appeal a denial of an application for attorney's fees in his own name.
 
 
 121
 Although it is clear that Ebbinghouse's interest meets Judge Wright's definition of that term, I hasten to emphasize that this definition is by no means exclusive, nor definitive. In fact, it is widely recognized that, since the 1966 amendments to Rule 24 appeared, no authoritative definition of this term has emerged. The Supreme Court's two major decisions in this area, Cascade National Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), and Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), offer little guidance. See generally 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 1908 (1986). Donaldson does say, as does the majority, that an interest must be "significantly protectable" before it can rise to the level of a Rule 24 interest. 400 U.S. at 528, 91 S.Ct. at 541. "But 'significantly protectable interest' has not been a term of art in the law and there is sufficient room for disagreement about what it means...." 7C Federal Practice and Procedure Sec. 1980 at 270.
 
 
 122
 Given our holdings in James and Lipscomb, and the realities of fee-shifting statutes, one is compelled to conclude that Ebbinghouse's derivative interest in statutory fees is a legally protectable interest. One's interest in a law suit need not be identical to that of a "party," as the majority suggests, before he can intervene. To illustrate, return to our remarks in Diaz, which follow our approval of Judge Wright's definition of a Rule 24 interest:
 
 
 123
 The interest [does not have] to be of a legal nature identical to that of the claims asserted in the main action.... All that is required is an interest in the property or other rights at issue, provided the other elements of intervention are present.
 
 
 124
 427 F.2d at 1124 (emphasis added). It is clear that Panola's right to fees under the EAJA was a right in which Ebbinghouse had a sufficient interest to intervene in the underlying litigation once Panola had dismissed him as counsel.
 
 
 125
 III. JEFF D. AND COERCIVE WAIVERS OF ATTORNEY'S FEES
 
 
 126
 This appeal concerns a public interest lawyer who, after providing years of excellent legal services,[6] tried to do everything possible to secure for himself a statutorily authorized attorney's fee.[7] As counsel for Panola, Ebbinghouse opposed the most formidable of civil litigants: the United States government. From all indications, the government's position in this case, from start to finish, was unreasonable. Yet today, the majority ignores this court's duty to ensure that the government does not take unfair advantage of indigent plaintiffs and the lawyers who choose to represent them. The court has missed an opportunity to instruct the government that its settlement posture in this case was inconsistent with the purposes of the EAJA. In order to escape liability for EAJA fees, the government told Panola, in effect, "if you don't get Ebbinghouse to give up his fee, or fire him, then we just can't do business." When the Supreme Court said in Jeff D. that the courts have no business interfering with "negotiated waivers of attorney's fees," 106 S.Ct. at 1540 (emphasis added), it did not express approval of the position taken by the government during the settlement negotiations in this case.
 
 
 127
 The narrow holding in Jeff D. is that a district court, in approving a 42 U.S.C. Sec. 1983 class action settlement pursuant to Fed.R.Civ.P. 23(e), has the power to sustain that portion of a settlement agreement which waives a prevailing party's right to attorney's fees and costs which might otherwise be sought pursuant to section 1988. There are a number of important distinctions between this case and Jeff D. The EAJA serves a very different purpose from section 1988, construed by the Supreme Court in Jeff D. In addition, the EAJA, unlike section 1988, provides for mandatory awards of attorney's fees. Equally important are the factual distinctions between the two cases. In Jeff D., the plaintiffs bargained away their right to attorney's fees in exchange for greater relief on the merits. Here, there was no such exchange. Plaintiffs' counsel in Jeff D. tried to have the district court void that portion of a settlement agreement which voluntarily waived attorney's fees. Here, plaintiff's counsel thought the government's demand for a fee waiver unreasonable and would not agree to it. He then tried unsuccessfully to seek the district court's assistance. In Jeff D., the Supreme Court found no indication that the settling defendant had acted improperly in bargaining for a waiver of attorney's fees. In this case, the district court, and now the majority, have created a procedural trap for lawyers which denies them the right to test the propriety of the government's bargaining position.
 
 
 128
 In Jeff D., the Court explained why it is important to permit the negotiation of section 1988 fees. The force of the Court's exposition in this regard derives from the purposes for which Congress passed section 1988, namely, "the promotion of respect for civil rights." Id. at 1539. Section 1988 is not the only mechanism provided by Congress to promote this objective; instead, it is but one component of the "arsenal of remedies available to combat violations of civil rights." Id. at 1540. The Court found that a general proscription against negotiated waivers of attorney's fees "in exchange for a settlement on the merits" might "impede vindication of civil rights." Id.
 
 
 129
 In contrast with section 1988, the EAJA is the only mechanism which reduces the effect of the tremendous resource imbalance between private citizens and the federal government so as to enable them to challenge unlawful or unreasonable government behavior. As is clear from the EAJA's legislative history, the statute
 
 
 130
 rests on the premise that certain individuals ... may be deterred from seeking review of, or defending against unreasonable governmental action because of the expense involved in securing the vindication of their rights. The economic deterrence to contesting governmental action are magnified in these cases by the disparity between the resources and expertise of these individuals and their government. The purpose of the [EAJA] is to reduce the deterrence and disparity by entitling certain prevailing parties to recover an award of attorney fees, expert witness fees and other expenses against the United States, unless the Government's action was substantially justified.
 
 
 131
 H.R.Rep. No. 1418, 96th Cong., 2d Sess. 5-6, reprinted in 1980 U.S.Code Cong. & Admin.News 4984. When faced with an indigent opponent such as Panola, which has been seeking assistance from the Farmer's Home Administration since 1970, see Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1553 (11th Cir.1985), the government can virtually nullify the effect and purpose of the EAJA by absolutely conditioning any form of immediate relief upon a waiver of attorney's fees.
 
 
 132
 Nothing indicates that Congress intended to make EAJA fees "nonnegotiable," as the Supreme Court found to be true of section 1988 fees. It is important to remember, however, that an award of EAJA fees, unlike a fee award under section 1988, is not within the discretion of a district court. This is a fact which the Supreme Court emphasized in Jeff D. See 106 S.Ct. at 1538, 1545. EAJA awards pursuant to 28 U.S.C. Sec. 2412(d)(1)(A) are mandatory. If the United States fails to carry its burden of demonstrating that its position was substantially justified, a district court is obliged to award fees and costs.[8] Cf. Jeff D., 106 S.Ct. at 1540 n. 22 (noting that Congress rejected proposal to make section 1988 fees mandatory). In this regard, it should be noted that the EAJA is more like the attorney's fee provision in the TILA, which we construed in James, than it is like section 1988. Compare 28 U.S.C. Sec. 2412(d)(1)(A) with 15 U.S.C. Sec. 1640 and 42 U.S.C. Sec. 1988.
 
 
 133
 As I discussed in Part I, the district court should have responded to Ebbinghouse's request for some form of judicial participation in the settlement process to determine the reasons for the government's desire to settle and whether its demand that settlement exclude payment of attorney's fees was coercive. Both of these factors would have informed the district court's judgment as to whether the government's position was substantially justified and, consequently, liable for EAJA fees. The majority denies the opportunity to lay bare the truth of the reason and justness of the government's position and frustrates the intent of Congress in passing the EAJA.
 
 
 134
 In addition to its discussion of the policies behind the civil rights statutes, the Supreme Court in Jeff D. also emphasized the economics of settlement in holding that section 1988 fees could be waived by a prevailing party:
 
 
 135
 To promote both settlement and civil rights, we implicitly acknowledged in Marek v. Chesney, [473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985),] the possibility of a tradeoff between merits relief and attorney's fees when we upheld the defendant's lump-sum offer to settle the entire civil rights action, including any liabilities for fees and costs.
 
 
 136
 106 S.Ct. at 1540. In accordance with this policy, the Court explained that fee issues may be so essential to settlement negotiations that it would do violence to the deal struck between the parties to permit a party that prevailed through settlement to challenge a portion of that settlement to which it has already agreed.[9] The Court said that it would be unfair to disturb the result bargained for by the state of Idaho because, in calculating what it was willing to give up in settlement, Idaho's agents necessarily incorporated the possibility of attorney's fees into its settlement calculus. This reasoning, so fundamental to the decision in Jeff D. has no application to cases concerning the EAJA because payment of EAJA awards is made possible through a separate fund appropriated by Congress. Thus, Jeff D.'s emphasis upon a section 1983 defendant's need to know its total exposure (the cost of relief to the plaintiffs, plus costs and fees) when negotiating a settlement is not relevant to the questions presented here.
 
 
 137
 The government was not evaluating its settlement position in this case with regard to some ball-park figure beyond which it would have considered settlement impossible. This is not to say that government attorneys are not duty bound to protect the EAJA fund from unwarranted dissipation. The government's interest in saving money is simply not an interest which informs the judicial interpretation of a fee-shifting statute. As a subcommittee of the D.C. Circuit's Judicial Conference has explained, "any such saving is plainly at odds with the purpose for which the fee-shifting statute was enacted." Final Subcommittee Report on Attorney's Fees of the U.S. Court of Appeals for the District of Columbia Circuit, quoted in Jeff D., 106 S.Ct. at 1544 n. 32. In cases where the United States' liability under the EAJA would otherwise be clear, the courts should prevent the government from escaping such liability by absolutely conditioning relief upon a waiver of fees. This is particularly true where there is evidence that the government coerced an indigent party to relinquish its right to attorney's fees or did not, as the Court discussed in Jeff D., offer greater relief in exchange for a fee waiver. Absolute demands for fee waivers are entirely inconsistent with the policy behind the EAJA, which is concerned primarily with unreasonable government conduct, as well as unreasonable government litigation positions. See generally H.R.Rep. No. 120, 99th Cong., 1st Sess. reprinted in 1985 U.S.Code Cong. & Admin.News 132.
 
 
 138
 The Jeff D. opinion itself suggests that in circumstances such as this, the courts should take a hard look at the government's settlement posture in cases against indigent opponents. The civil rights plaintiffs in Jeff D. and various amici curiae, argued that settlements with fee waivers should be scrutinized carefully when, for example, a government defendant had adopted a uniform practice of "insisting on a fee waiver as a condition of settlement in civil rights litigation." 106 S.Ct. at 1543. In addition, the United States Solicitor General argued that fee waivers might be invalidated where "the defendant had 'no realistic defense on the merits,' or if the waiver has part of a 'vindictive effort ... to teach counsel that they had better not bring such cases.' " Id. at 1544 (citations omitted). Although the Court acknowledged that such practices might nullify the intended effect of a fee-shifting statute designed to benefit those who cannot afford counsel, it declined to reach these arguments for the simple reason that the record did not indicate that Idaho had adopted a consistent policy of requiring fee waivers. Specifically, the Court explained that the plaintiffs "ha[d] not offered to prove that the petitioners' tactics ... merely implemented a routine state policy designed to frustrate the objectives of the Fees Act," or deter civil rights representation generally. 106 S.Ct. at 1544. The Court was skeptical that such practices could work, in the aggregate, to cause the pool of civil rights counsel to contract substantially.[10] And because there was "no reason or documentation to support such a concern," it concluded that comment on the issue would be premature.
 
 
 139
 Ebbinghouse did raise these concerns before the district court but it is impossible to evaluate their validity because the district court and the majority have made it impossible for Ebbinghouse to develop the record by holding that he has no right to intervene. Nevertheless, we do know that in attempting to settle this case, the government "insisted" that it not be liable for any attorney's fees. See Record, Vol. I, Tab 120 at 2 (district court opinion). To see that such a policy should not be condoned, one should consider Judge MacKinnon's opinion in Moore v. National Association, 762 F.2d 1093 (D.C.Cir.1985).[11] An important issue in Moore, as in Jeff D., was whether the courts ought to bar the simultaneous negotiation of merits relief and fees in cases where a fee-shifting statute is involved. In concluding that there should be no such bar, the court said,
 
 
 140
 What we have here, ... is a plaintiff who, after extensive discovery, on her own initiative and through counsel, sought to settle her case through offers of settlement.
 
 
 141
 Id. at 1104 (emphasis in original). Crucial to Judge MacKinnon's reasoning was the " 'distinction between plaintiff-suggested waiver[s] and defendant-coerced waiver[s].' " Id. at 1104 n. 15 (quoting id. at 1114 (Wright, J., dissenting)). Ultimately, the question in Moore, as well as Jeff D., was whether a civil rights plaintiff could "voluntarily" waive its right to fees. Id. at 1094.[12] In Jeff D., the majority highlighted the voluntary nature of the plaintiffs' fee waiver and stressed the fact that Idaho's settlement offer "was more favorable than the probable outcome of a trial." 106 S.Ct. at 1538. See also id. at 1535 (plaintiffs' counsel conceded that Idaho's settlement offer provided more relief than a court could provide). Here, there is simply no indication that the relief offered by the government in settling this case "constituted an adequate quid pro quo for [Panola's] waiver of attorney's fees." Id. at 1544. Panola's right to attorney's fees were not "exchanged for injunctive relief of equivalent value," id. at 1544 n. 33, but abandoned in the face of the real possibility that FmHA funding would soon become unavailable. See Appendix II to Majority Opinion.
 
 IV. CONCLUSION
 
 142
 In light of Jeff D., attorneys know that when statutory fees are an issue, any challenge to the settlement position assumed by government entities must take place before a settlement is executed. A party cannot agree to a waiver of attorney's fees and then attack that waiver as invalid. By instructing the district courts that they are free to disregard the dynamics of settlement negotiations, the majority has eliminated an entire class of such challenges which could otherwise take place before settlement negotiations break down. In holding that a lawyer cannot challenge the government's settlement posture, once he has been fired, the majority has foreclosed the possibility that such challenges will ever take place. The decision in this case will undoubtedly encourage the government to require EAJA fee waivers in the future. Equally disturbing is that it creates an incentive for the government to interfere with the usual alignment of interests between attorneys and clients. See generally Note, Fee Waivers and Civil Rights Settlement Offers: State Ethics Prohibitions After Evans v. Jeff D., 87 Colum.L.Rev. 1214 (1987); Wolfram, The Second Set of Players: Lawyers, Fee Shifting, and the Limits of Professional Discipline, 47 Law & Contemp. Probs. 293 (1984); Goldstein, supra, 20 Clearinghouse Rev. at 694-95.
 
 
 143
 As if to suggest that the result in this case is not a harsh one, the majority says that Ebbinghouse may again seek to intervene to enforce an attorney's lien if Panola acquires monies which are not controlled by federal law. The majority does not say what the source of these monies might be. Yet if the government has failed to act with substantial justification, it is the EAJA which should provide the monies for payment of attorney's fees, not Panola. Still, the majority has indicated to Ebbinghouse that the only route to compensation is attacking the resources of his former indigent client which he has long fought to augment. This absurd result has not come about because of any collusive conduct on the part of the client, as is often the case when the attorney/client relationship dissolves on the eve of settlement; nor is it due to any failing on the part of Ebbinghouse. Instead, it is because the government "insisted" that it not be liable for any attorney's fees.
 
 
 144
 The EAJA seeks to offset the effects of "unreasonable governmental action" by placing resources in the hands of those who might otherwise "be deterred from seeking review" of such action. H.R.Rep. No. 1418, 96th Cong., 2d Sess. 5, reprinted in 1980 U.S.Code Cong. & Admin.News 4984. If the United States demands fee waivers as a prerequisite for settling any case which involves potential liability for EAJA fees, it can nullify the intended purpose of the Act. In this case, by conditioning immediate access to scarce FmHA funds by an absolute waiver of attorney's fees, the government gained an advantage which the EAJA clearly seeks to deny it.
 
 
 145
 For the foregoing reasons, I respectfully dissent.
 
 
 
 *
 Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 The underlying case was filed through Legal Services Corporation of Alabama, Inc. Panola was allowed to proceed in forma pauperis
 
 
 [2]
 See APPENDIX I. EAJA
 
 
 [3]
 Ebbinghouse executed a written contract with Legal Services which provided that Legal Services would pay him a "retainer to cover only a portion of his time expended at less than one-half his hourly rate and his out of pocket expenses;" that he was to reimburse Legal Services from "any fee awarded" in the underlying case. (Brief for Appellant at 8, 9.) He has no fee agreement with Panola
 
 
 [4]
 None of the special circumstances which require the Court to approve a settlement were present in this case
 
 
 [5]
 See APPENDIX II. Letter
 
 
 [6]
 See APPENDIX III. "Settlement Agreement"
 
 
 [7]
 Appellant presents as his first issue on appeal the following question: "When an attorney is fired by his indigent client because he refuses to sign a settlement agreement that contains waiver of fees that is insisted upon by agencies of the United States, the Defendants, as a condition to any settlement, i.e., it is a coerced waiver of fees, and the client through another attorney executes the agreement, does the attorney have standing to raise the Evans exceptions to waiver of attorneys fees?"
 Along with his motion to intervene, the Appellant filed a paper styled "motion for Evans hearing." "Evans " refers to Evans v. Jeff D., 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), a class action. "Evans hearing" refers to the hearing conducted in that case by the trial judge under Fed.R.Civ.P. Rule 23(e). "Evans exceptions" is the Appellant's term for an argument advanced in the Supreme Court by the class representative (respondent) that 42 U.S.C.A. Sec. 1988 precluded petitioners (the governor and other public officials of the State of Idaho) from adopting a consistent policy of insisting upon an attorney fee waiver as a condition of settlement in civil rights litigation and for a suggestion made by the Solicitor General, one of the amici in the case, that a fee waiver included in a class action settlement need not be approved by the district judge when the defendants had "no realistic defense on the merits," or if the waiver was part of a "vindictive effort.... to teach counsel that they had better not bring such cases." In view of the evidentiary record, the Supreme Court found it unnecessary to evaluate either the argument or the suggestion.
 
 
 [8]
 The standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition against a litigant's raising another person's legal rights. Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)
 
 
 [9]
 Admittedly, there is no precise definition for the interest a would be intervenor must claim in order to qualify under Rule 24(a). However, Judge Skelly Wright's definition in Hobson, adopted by the Fifth Circuit in Diaz, is sufficient for the purpose of this case. The intervention sought here involves a fundamental prudential consideration of the standing doctrine. It does not involve the more complex "standing" considerations required in cases such as Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) and cases cited there, which bring into play the constitutional scheme of Separation of Powers
 
 
 [10]
 Ebbinghouse also sought to intervene in order to raise the "common fund," the "common benefit," and the "bad faith" exceptions to the American rule regarding payment of attorneys' fees. The district judge did not address those claims. Consequently, they are not before this court. However, we do recognize the reasonableness of the district judge's not having considered them. Suffice it to say, the circumstances underlying this matter do not resemble the circumstances which bring into play the "common fund" equitable doctrine or its extension, the "common benefit" equitable doctrine. As to the "bad faith" doctrine, Ebbinghouse asserts that the defendants' conduct gave him "an independent claim for attorney's fees under the EAJA," in that the defendants' conduct constituted "intentional interference" with the long standing attorney-client relationship that had existed between him and Panola. It appears that Appellant misconceives the substance and purpose of Section 2412(b) of the EAJA. That section does not alter in any way the doctrines that make up the traditional exceptions to the American rule
 
 
 [11]
 The limitations placed upon eligibility are set out in the definitions of "Party." Sec. 2412(d)(2)(B)
 
 
 [12]
 Sec. 2412(d)(1)(A) provides for an award of fees and other expenses to a private party who prevails in any civil action (other than cases sounding in tort) against the government unless the "position of the U.S. was substantially justified or special circumstances make an award unjust."
 
 
 [13]
 " 'Fees and other expenses' includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees ..." Sec. 2412(d)(2)(A)
 
 
 [14]
 One hundred thirty four years ago the "fee bill" of 1853, 10 Stat. 161 (now 28 U.S.C. Sec. 1923) made attorneys' fees recoverable as taxable costs in certain situations
 
 
 [15]
 There are few exceptions. See, e.g., Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 Sec. 13, 33 U.S.C.A. Sec. 928(a), (in an administrative proceeding necessitated by employer's controversion of employee's workmen's compensation claim, reasonable attorneys' fees taxed against unsuccessful employer and paid directly to the attorney)
 
 
 [16]
 By 1796 there had evolved a general rule known as the American rule denying the routine recovery of attorneys' fees from the opposing party. Arcambel v. Wiseman, 1796, U.S., 3 U.S. (Dall.) 306, 1 L.Ed. 613. The American rule was a deliberate departure from the English practice. Conte v. Flota Mercante Del Estado, 277 F.2d 664 (2d Cir.1960)
 
 
 [17]
 Having observed that James involves an attorney's standing to pursue his client's claim for attorney's fees under TILA and that James is silent on the question of an attorney's right of action where the client has expressly waived any claim of attorney's fees, the D.C. Circuit in Freeman disagreed with James "to the extent that language in James suggests a more general right of action under TILA by attorneys for their fees." James is not in point in this case, and we do not repudiate James, implicitly or otherwise
 
 
 [18]
 In Evans, the Supreme Court stated in dictum that by enacting 42 U.S.C.A. Sec. 1988, the Civil Rights Attorneys' Fees Award Act, "Congress neither bestowed fee awards upon attorneys nor rendered them non-waivable or non-negotiable." 106 S.Ct. at 1533, 89 L.Ed.2d at 760. Upon the facts in the case, Evans, a class action, holds that in consideration of the extent of equitable relief provided in a settlement in the case and the absence of countervailing factors, the district court did not abuse its discretion in upholding a fee waiver and refusing to award fees following a consent decree signed by the parties
 
 
 [19]
 Of course, state attorney's lien statutes may be applied in the federal courts so long as the state's procedure for enforcement of the attorney's lien and the state's statute establishing the priority of any such lien do not do violence to federal procedural statutes and rules and to the priorities of encumbrances as established by federal statutes
 
 
 [20]
 18 Code of Alabama Sec. 34-3-61 (1975) (a) Attorneys-at-law shall have a lien on .... (b) "Upon actions and judgments for money, they shall have a lien superior to all liens but tax liens, and no person shall be at liberty to satisfy said action or judgment, until the lien or claim of the attorney for his fees is fully satisfied; and attorneys-at-law shall have the same right and power over action or judgment to enforce their liens as their clients had or may have for the amount due thereon to them."
 
 
 [21]
 Because the underlying case has not settled and in view of the relationship between the attorney fee waiver and the release of liability provisions of the "settlement agreement," it is not inconceivable that Panola yet will be in position to seek attorney fees and other expenses under the EAJA
 
 
 [1]
 See United States v. Certain Real Estate Property, 838 F.2d 1558, 1561 (11th Cir.1988); Stratton v. Bowen, 827 F.2d 1447, 1449 (11th Cir.1987) (citing H.R.Rep. No. 1418, 96th Cong. 2d Sess. 10, reprinted in 1980 U.S.Code Cong. & Admin.News 4984, 4989); Haitian Refugee Center v. Meese, 791 F.2d 1489, 1496 (11th Cir.1986)
 
 
 [2]
 This active role which many judges take in encouraging settlement has been subject to criticism. See generally Resnik, Managerial Judges, 96 Harv.L.Rev. 376 (1982). But no one doubts that many judges play a pivotal role in shaping settlement negotiations. For works written by federal judges which advocate an active judicial role in the settlement process, see Lambros, The Judge's Role in Fostering Voluntary Settlements, 29 Vill.L.Rev. 1363 (1984); R. Will, R. Merhige & A. Rubin, The Role of the Judge in the Settlement Process 4-7 (1977). The latter work was the result of a seminar conducted by the Federal Judicial Center for new district judges. See Comment, Objectivity and Accountability: Limits on Judicial Involvement in Settlement, 1987 U.Chi. Legal F. 369, 372 n. 7
 
 
 [3]
 A recent survey of trial lawyers in four jurisdictions also suggests that lawyers generally prefer to have a district judge take an active role in the settlement process. See Brazil, What Lawyers Want From Judges in the Settlement Arena, 106 F.R.D. 85 (1985)
 
 
 [4]
 For reasons which are unclear, the majority adopts the D.C. Circuit's "limited reading" of our decision in James. See Majority Opinion at 2819-20, n. 17 (discussing Freeman v. B & B Associates, 790 F.2d 145, 148-49 (D.C.Cir.1986)). The majority's suggestion that James concerns "an attorney's standing to pursue his client's claim for attorney's fees" is inexplicable in light of James's holding that the attorney had a independent right to pursue a statutory fee award. Compare Majority Opinion at 2820 n. 17 with James, 689 F.2d at 1358
 
 
 [5]
 For an indication that Congress intended to give the EAJA term "prevailing party" the same meaning it has in other fee-shifting statutes, see H.R.Rep. 1418, 96th Cong., 2d Sess. 11, reprinted in 1980 U.S.Code Cong. & Admin.News, 4984, 4990
 
 
 [6]
 Including a successful appeal to this court. See Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550 (11th Cir.1985)
 
 
 [7]
 It should be noted that there is no suggestion in this case that Ebbinghouse violated his ethical duty to exercise independent judgment on Panola's behalf
 
 
 [8]
 The EAJA provides:
 Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
 28 U.S.C. Sec. 2412(d)(1)(A) (emphasis added).
 
 
 [9]
 But, as one commentator has explained, although the Court "correctly stat[ed] the formula for the defendant's settlement incentives," it "failed to address the crucial analytic question: whether the benefits of allowing simultaneous negotiation of fees and merits (in encouraging settlements) exceed the costs of doing so (in deterring desirable litigation). Miller, Attorney Fees in the Supreme Court, 72 A.B.A.J. 40 (Nov. 1, 1986)
 
 
 [10]
 The dissenters, however, found this proposition "embarrassingly obvious." 106 S.Ct. at 1554 (dissenting opinion)
 
 
 [11]
 In Moore, each member of the three-judge panel filed a separate opinion
 
 
 [12]
 The Moore court held "that in a Title VII class action plaintiffs may, voluntarily and on their own initiatives, offer a waiver or concession of possible claims for fees and costs to encourage settlement." 762 F.2d at 1105